IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LEO INVESTMENTS HONG KONG LIMITED, | § § § § | CONSOLIDATED No. 415, 2025 No. 428, 2025 |
| Plaintiff Below, Appellant/Cross-Appellee, | § § § | |
| v. | § § | Court Below:  Court of Chancery of the State of Delaware |
| TOMALES BAY CAPITAL ANDURIL III, L.P., TOMALES BAY CAPITAL ANDURIL III GP, LLC, and IQBALJIT KAHLON, | § § § § § | C.A. No. 2022-0175 |
| Defendants Below, Appellees/Cross-Appellants. | § § § | |

Submitted:  April 15, 2026
Decided:     July 10, 2026

Before **SEITZ**, Chief Justice; **TRAYNOR**, **LEGROW**, **GRIFFITHS**, Justices, and **WALLACE**, Judge,[1] constituting the Court *en Banc*.

Upon appeal from the Court of Chancery of the State of Delaware.  **AFFIRMED in part and REVERSED in part.**

Charlotte K. Newell, Esquire (*argued*), Eamon P. Joyce, Esquire, and Tyler J. Domino, Esquire, SIDLEY AUSTIN LLP, New York, New York; A. Thompson Bayliss, Esquire, and Adam K. Schulman, Esquire, ABRAMS & BAYLISS LLP, Wilmington, Delaware, *for Plaintiff-Appellant/Cross-Appellee Leo Investments Hong Kong Limited*.

---

[1] Sitting by designation under DEL. CONST. art. IV, § 12 and Supreme Court Rules 2(a) and 4(a) to complete the quorum.

George W. Hicks, Jr., Esquire (*argued*), KIRKLAND & ELLIS LLP, Washington, DC; Aaron H. Marks, Esquire, Amal El Bakhar, Esquire, and Ava Roche, Esquire, KIRKLAND & ELLIS LLP, New York, New York; David E. Ross, Esquire, Eric D. Selden, Esquire, Thomas A. Barr, Esquire, and A. Gage Whirley, Esquire, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware, *for Defendants-Appellees/Cross-Appellants Tomales Bay Capital Anduril III, L.P., Tomales Bay Capital Anduril III, GP, LLC, and Iqbaljit Kahlon*.

**LEGROW**, Justice:

This dispute arises from a China-based company's failed attempt to invest indirectly in SpaceX, which was then a private company. After the company publicly disclosed that it had been admitted to a fund that was planning to invest in SpaceX, SpaceX balked and the company was removed from the fund. The Court of Chancery held that the company had not proved its loyalty- and care-based fiduciary duty claims, but found that the fund, through its principal, breached its "duty of candor." The court awarded nominal damages and attorneys' fees. We affirm the court's holdings as to the business judgment rule's application and the fund's failure to communicate honestly, but we reverse the fee-shifting award.

Leo Investments Hong Kong Limited's ("Leo Group") investment in Tomales Bay Capital Anduril III, L.P. ("the Fund") was short-lived and rocky. The Fund's principal admitted the publicly traded Chinese company as a limited partner, knowing that SpaceX had a preference against China-based investors and against public disclosure of investments in SpaceX. Before admitting Leo Group to the Fund, the parties negotiated the terms of Leo Group's required public disclosure of the investment. Leo Group disclosed its investment consistent with those terms and issued a press release. The press release attracted media coverage.

When SpaceX learned of the investment through a news article, it expressed its strong disapproval to the Fund's principal. The principal panicked, blamed Leo Group for the media attention, and did not tell SpaceX that he had approved the

1

terms of the disclosure. This approach did nothing to de-escalate the situation. SpaceX informed the principal that the Fund would not be able to purchase SpaceX shares with Leo Group as a limited partner. To appease SpaceX quickly, the principal asked Leo Group to withdraw voluntarily. When Leo Group refused, the principal unilaterally removed it as a limited partner.

Leo Group sued the Fund, its General Partner, and the principal, alleging breach of the Limited Partnership Agreement ("LPA") and breach of fiduciary duties. After trial, the Vice Chancellor found only that the principal had breached his "duty of candor," awarding the company $1 in nominal damages and nearly $16 million in attorneys' fees.

Both parties appealed. Leo Group argues that the court erred by finding that the business judgment rule applied and that the defendants did not violate the Subscription Agreement's forum-selection provision by filing other litigation in California. The principal and related entities contend that the court erred in finding a breach of the "duty of candor" and in awarding Leo Group its requested attorneys' fees.

We reverse the Court of Chancery regarding the availability of fee-shifting under these circumstances. As to the court's other holdings challenged on appeal, we affirm.

2

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

Before June 12, 2026, Space Exploration Technologies Corp. ("SpaceX") was a privately held company.[2] SpaceX maintained a right of first refusal ("ROFR") in any shares a holder sought to sell. SpaceX was known to be selective about its investors, and it worked with a limited number of intermediaries to assemble would-be investors into funds that then purchased SpaceX shares. Out of concern that the presence of certain foreign investors could hamper its competitiveness for contracts with the United States government, SpaceX preferred not to have investors based in certain countries, including the People's Republic of China. But SpaceX permitted investment from China-based investors in the past when the investment was made through intermediate entities based in other countries or Hong Kong.[3]

SpaceX also preferred not to be surprised by an investor publicly disclosing their investment in SpaceX, but the company permitted investors to disclose a SpaceX investment when the disclosure was required by law.[4] SpaceX expected its

---

[2] This Court adopts the facts as found by the Court of Chancery in the proceedings below. Opening Br. Ex. A (Post-Trial Op.) (listed on Westlaw as *Leo Invs. Hong Kong Ltd. v. Tomales Bay Cap. Anduril III, L.P.*, 342 A.3d 1166, 1182 (Del. Ch. 2025)). On June 12, 2026, SpaceX's shares began trading on the Nasdaq. Brian O'Connell and Rachel McVearry, *SpaceX Stock Just Launched. What Investors Should Know After the IPO*, U.S. NEWS, https://money.usnews.com/investing/articles/spacex-stock-just-launched-what-investors-should-know-after-the-ipo (last visited July 10, 2026).

[3] Opening Br. Ex. A (Post-Trial Op. at 5).

[4] *Id.* (Post-Trial Op. at 5).

trusted intermediaries to abide by and enforce these preferences. If SpaceX disapproved of a potential investor, the ROFR operated as a failsafe.[5]

Iqbaljit Kahlon formed Tomales Bay Capital, L.P. ("TBC") to create funds to invest in late-stage technology companies like SpaceX. By 2021, Kahlon had become one of SpaceX's few trusted intermediaries. In that year, Kahlon had the opportunity to acquire SpaceX shares owned by a fund controlled by Suhail Rizvi.[6] Kahlon established the Fund in a bid to acquire the Rizvi shares, which were valued at $528 million. The Fund is managed by the General Partner, and Kahlon is the General Partner's managing member.

Kahlon asked Gulf Asia Venture Group ("Gulf Asia") to help find investors for the Fund. If approved by Kahlon, TBC admitted investors to the Fund as limited partners through an LPA. Typically, the LPA restricted limited partners from disclosing any information about the partnership and contained strict pre-conditions before a limited partner could make any legally required disclosure.[7]

Gulf Asia identified Leo Group, a publicly traded corporation in China, as a potential investor.[8] Kahlon was aware of SpaceX's sensitivity toward investments

---

[5] *See id.* (Post-Trial Op. at 3).

[6] *Id.* (Post-Trial Op. at 6–7).

[7] Answering Br. at 8 (citing App. to Opening Br. at A1079 (LPA)).

[8] The Vice Chancellor noted that:

> Technically, the investor was plaintiff Leo Investments Hong Kong Limited, a limited liability company organized under the laws of Hong Kong (the "Investment

4

by China-based companies; previously, Kahlon had worked with prospective China-based investors by using an intermediary entity in Hong Kong or the Cayman Islands.[9] Those China-based entities, however, were not publicly traded and had no public disclosure obligations.[10] Leo Group is traded on the Shenzhen Stock Exchange ("SZSE"), but Leo Group's position as a publicly traded company did not cause Kahlon any immediate concern.

Kahlon began negotiating investment terms with Leo Group. The parties discussed Leo Group's disclosure obligations at length before ultimately agreeing that a regulatory disclosure with minimal information would be acceptable.[11] Kahlon was initially hesitant about Leo Group naming SpaceX in the announcement because of SpaceX's preferences, but Kahlon ultimately agreed that identifying SpaceX as the Fund's targeted investment would be okay if it was required for regulatory compliance.[12] The parties negotiated a side letter permitting Leo Group

---

Vehicle"). The Investment Vehicle is an indirect, wholly owned subsidiary of Leo Group. Although the distinctions between Leo Group and the Investment Vehicle remain important for many reasons, they are not critical to this case. This decision refers for simplicity to Leo Group.

Opening Br. Ex. A (Post-Trial Op. at 16 n.71).

[9] *Id.* (Post-Trial Op. at 5).

[10] *Id.* (Post-Trial Op. at 5).

[11] *Id.* (Post-Trial Op. at 10–11).

[12] *See id.* (Post-Trial Op. at 9–13).

to make a regulatory disclosure and agreed upon a draft of the disclosure's anticipated content ("Side Letter").

The parties signed all required documents, including the LPA and Side Letter, on November 15, 2021. As was his standard practice, Kahlon did not discuss Leo Group's investment with SpaceX before admitting Leo Group into the Fund; he "did not anticipate any problems with Leo Group's investment" and believed Leo Group's indirect investment would be "acceptable."[13]

Later that day, Leo Group filed its disclosure with the SZSE. Without Kahlon's knowledge, Leo Group paired the disclosure with an announcement promoting its SpaceX investment, which covered the same information contained in the required disclosure. "The announcement drew considerable media attention" with "articles generat[ing] millions of views."[14] When Kahlon saw a news article regarding the investment, he feared that the media attention would damage "his own relationship with SpaceX."[15]

In response, Kahlon requested that Leo Group "contain the media attention" in hopes that "SpaceX would not find out."[16] Leo Group agreed to work with the press and take down the articles. Kahlon still did not notify SpaceX about Leo

---

[13] *Id.* (Post-Trial Op. at 16–17).

[14] Opening Br. Ex. A (Post-Trial Op. at 18).

[15] *Id.* (Post-Trial Op. at 22).

[16] *Id.* (Post-Trial Op. at 21–22).

Group's investment, its regulatory disclosure, or the media attention. Instead, Kahlon sought to "push the deal through," moving quickly to start the 30-day ROFR period.[17] Kahlon also began looking for replacement investors, through Gulf Asia, anticipating that SpaceX might object to Leo Group's involvement in the Fund.

On November 19, SpaceX's CFO, Bret Johnsen, sent Kahlon an email asking about Leo Group's investment and linking one of the media articles that followed Leo Group's disclosure. Kahlon immediately called Johnsen. During the call, Johnsen voiced several concerns, in particular that "the investment could trigger review by the Committee on Foreign Investment in the United States" and disadvantage SpaceX in bidding for government contracts.[18] Kahlon did not disclose any of his discussions with Leo Group or tell Johnsen that he had approved the public disclosure. At the conclusion of the call, Johnsen informed Kahlon that the Fund would not be allowed to invest in SpaceX if Leo Group remained a limited partner. Kahlon "did not think there was any possibility that Johnsen would change his mind" about Leo Group's participation in the Fund.[19]

After the call, Kahlon acted promptly to remove Leo Group from the Fund, moving quickly because the initial closing for the Fund was to begin in ten days and

---

[17] *Id.* (Post-Trial Op. at 20).

[18] *Id.* (Post-Trial Op. at 23).

[19] *Id.* (Post-Trial Op. at 25).

SpaceX was in the process of deciding whether to exercise its ROFR. Kahlon first drafted a communication plan that he sent to Gulf Asia.[20] The proposed communication plan contained untrue statements about the reasons for SpaceX's opposition in order to convince Leo Group to withdraw from the Fund. On November 20, 2021, Gulf Asia informed Leo Group that Kahlon was unilaterally removing it from the Fund at SpaceX's insistence.

The next day, Kahlon, Gulf Asia, and Leo Group convened on a video conference. Leo Group opposed its removal from the Fund, but its opposition fell on deaf ears. Kahlon insisted on Leo Group's removal, and he forwarded a proposed letter agreement that called for Leo Group to acknowledge that its removal was necessary and to abide by a post-removal confidentiality provision. Leo Group objected to the confidentiality obligation and suggested that it would be better if the Fund would "continue to work with us and maintain active communication with SpaceX to help retain our LP share."[21] Kahlon was not persuaded to change course, and he invoked the withdrawal provision in the Fund's LPA. Hours later, he informed Johnsen that Leo Group was out of the Fund and allowed Johnsen to conclude that Leo Group was the "bad actor."[22]

---

[20] Opening Br. Ex. A (Post-Trial Op. at 25–26).

[21] *Id.* (Post-Trial Op. at 28).

[22] *Id.* (Post-Trial Op. at 29).

On November 22, Leo Group reiterated that it would not voluntarily withdraw. Kahlon responded by returning Leo Group's $50 million investment and sending a unilateral termination letter that cited "materially burdensome compliance obligations" if Leo Group remained in the Fund.[23] Kahlon also sent Johnsen a letter documenting his version of "what happened" with Leo Group.[24]

The next day, Leo Group's attorneys emailed Kahlon, contending that the forced withdrawal violated the LPA and asking for justification for the action. Kahlon responded that Leo Group's continued participation would "result in a significant and adverse delay to the proposed deal we had discussed and therefore we had to exercise our rights under the LPA for a unilateral withdrawal."[25] Leo Group's attorneys asked for supporting evidence; Kahlon did not respond.

On December 13, 2021, SpaceX exercised its ROFR on the Rizvi shares, stating that Elon Musk, SpaceX's founder, wanted to purchase them. Musk purchased the vast majority of the Rizvi shares, but a small number, which Kahlon purchased for a different fund, were released to Kahlon four days later.[26] Five

---

[23] *Id.* (Post-Trial Op. at 29).

[24] *Id.* (Post-Trial Op. at 29–30).

[25] *Id.* (Post-Trial Op. at 30–31).

[26] Opening Br. Ex. A (Post-Trial Op. at 31).

months later, the Fund purchased SpaceX shares at a higher price per share than the Rizvi shares.[27]

## B.    Procedural History

In February 2022, Leo Group sued Kahlon, the General Partner, and the Fund in the Court of Chancery for breaches of fiduciary duty and breaches of the LPA.[28]

At the summary judgment stage, the court granted partial summary judgment *sua sponte* in favor of Leo Group, holding that Leo Group's "agreed-upon disclosures in Exhibit A to the Side Letter[,] to the extent the disclosures were required by law[,]" were permitted under the parties' agreements.[29]  Before trial, the court partially granted both parties' motions *in limine* asserting competing spoliation-of-evidence claims.  After finding that both parties had spoliated some evidence, the court held that Kahlon would face a heightened "clear and convincing evidence" standard for any issues on which he bore the burden of proof.  The court also barred Leo Group from presenting evidence about its drafting of the media announcements and its discussions with public relations firms about the investment because Kahlon was "deprived of [] the back and forth between the PR folks and

---

[27] *Id.* (Post-Trial Op. at 32).

[28] For ease, we refer to all defendants collectively as "Kahlon" unless a distinction between the defendants is required.

[29] Opening Br. Ex. B (Order and Final Judgment at 2) (stating that "[t]he plain language of . . . the Side Letter . . . renders Section 7.12(a) of the [LPA] . . . inapplicable for purposes of Plaintiff's ability to issue the agreed-upon disclosures in Exhibit A to the Side Letter to the extent the disclosures were required by law.").

[Leo Group] about the drafting of these PR materials and whatever strategy they were pursuing."[30]

After a three-day trial, the court held that Leo Group failed to prove that Kahlon breached his duties of care and loyalty; the court concluded that Leo Group "failed to rebut any of the presumptions of the business judgment rule" and that Kahlon's actions were "plainly rational" and "perhaps the only choice available."[31] The court went on to hold in the alternative that even if entire fairness applied, Kahlon would prevail.[32] The court, however, ruled *sua sponte* that Kahlon breached his "duty of candor" in his discussions with Leo Group surrounding the forced withdrawal. The court awarded Leo Group nominal damages of $1 because it did not prove "reliance or any causally related harm" with respect to that breach.[33]

The court also held that Kahlon did not breach the LPA. It made findings regarding Kahlon's compliance with the withdrawal provision, efforts provision, timing requirements, and forum-selection provision. Leo Group only challenged the forum-selection ruling on appeal. Regarding fees and expenses, the court ruled that

---

[30] App. to Opening Br. at A191, A199 (Oral Argument for Motions *in Limine*).

[31] Opening Br. Ex. A (Post-Trial Op. at 59).

[32] *Id.* (Post-Trial Op. at 64–65) (stating that, even under the heightened clear-and-convincing-evidence standard, Kahlon "proved that their actions were entirely fair to the Fund and its partners as a whole," and Kahlon's quick action prevented any further harm to the Fund's ability to invest in SpaceX).

[33] *Id.* (Post-Trial Op. at 69).

11

Leo Group was entitled to all its litigation expenses, including attorneys' fees, due to Kahlon's breach of the "duty of candor." Both sides appealed the court's judgment.

## II. STANDARD OF REVIEW

We review questions of law, including whether the Court of Chancery applied the correct standard of review and issues of contract interpretation, *de novo*.[34] We review factual findings for clear error[35] and fee awards for abuse of discretion.[36]

## III.   ANALYSIS

### A.   The Court of Chancery did not err in holding that the business judgment rule applied.

The court held that Leo Group failed to rebut the presumption of the business judgment rule, concluding that Leo Group did not prove that the defendants breached their duties of loyalty or care.[37] On appeal, Leo Group contends that the Court of

---

[34] *Terrell v. Kiromic Biopharma, Inc.*, 338 A.3d 1272, 1276 (Del. 2025); *Coster v. UIP Companies, Inc.*, 255 A.3d 952, 959 (Del. 2021) (citations omitted).

[35] *Coster*, 255 A.3d at 959 (citations omitted).

[36] *DeMatteis v. RiseDelaware Inc.*, 315 A.3d 499, 508 (Del. 2024).

[37] The business judgment rule "creates a presumption 'that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the corporation.'" *Polk v. Good*, 507 A.2d 531, 536 (Del. 1986) (citation omitted). "The burden is on the party challenging the decision to establish facts rebutting the presumption." *Maffei v. Palkon*, 339 A.3d 705, 728 (Del. 2025). "But, '[i]f the presumption of the business judgment rule is rebutted . . . the burden shifts to the [] defendants to prove to the *trier of fact* that the challenged transaction was "entirely fair" to the [] plaintiff.'" *Id.* (quoting *Emerald P'rs v. Berlin*, 787 A.2d 85, 91 (Del. 2001) (emphasis in original)). If the presumption is not rebutted, then the defendant's actions only needed to be rational, not the most rational. *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010) (stating that, for

12

Chancery's analysis foundered because the court framed its inquiry too narrowly and failed to consider the entirety of the defendants' challenged conduct. Leo Group alleges that "[t]he trial court erred by focusing only on Kahlon and the General Partner's conduct in responding to Johnsen's reaction to Kahlon's November 19 call."[38] In Leo Group's view, had the Court of Chancery considered Kahlon's misconduct beginning with the concealment from SpaceX of Leo Group's investment and the Side Letter, the court would have found that Leo Group had rebutted the business judgment rule's presumption by proving that the defendants' actions were grossly negligent or disloyal.[39] Leo Group continues that, if entire fairness had been applied properly, Kahlon would have been unable to meet that burden. In response, Kahlon endorses the court's finding of no breach, noting that the court stated that the defendants would prevail even under an entire-fairness analysis. We affirm the Court of Chancery's holding that Leo Group did not rebut the business judgment rule's presumption.

To frame the inquiry, we first distinguish when Kahlon owed a duty to the Fund as a whole from when he owed one to Leo Group alone. Here, the parties agree. As a fiduciary, Kahlon owed a duty "to the [p]artnership for the benefit of all

the business judgment rule, "the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives").

[38] Opening Br. at 28.

[39] *Id.*

13

of its limited partners."[40] Furthermore, when Kahlon chose to communicate with an individual partner, he was required to communicate honestly.[41] He could not, however, prioritize an individual partner's needs over others or above the partnership as a whole.[42]

### 1. Duty of Loyalty

Regarding its duty of loyalty claim, Leo Group reasons that the Court of Chancery erred by finding no conflict of interest or bad faith because the court exclusively focused on Kahlon's actions after the November 19 call with Johnsen. Leo Group contends that if the court had broadened its lens to consider Kahlon's earlier lies and omissions to SpaceX and Leo Group, the court necessarily would have concluded that Kahlon acted disloyally to promote his own self-interest. Even with Kahlon's earlier conduct in mind, however, the court did not err in holding that Leo Group failed to prove a breach of the duty of loyalty.

To establish that Kahlon acted disloyally, Leo Group sought to prove that Kahlon prioritized his personal relationship with SpaceX over the Fund's interests

---

[40] *Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC*, 2014 WL 5192179, at *10 (Del. Ch. Oct. 10, 2014) (citation omitted).

[41] *See Lonergan v. EPE Holdings, LLC*, 5 A.3d 1008, 1023 (Del. Ch. 2010) (citing *Malone v. Brincat*, 722 A.2d 5, 14 (Del. 1998) to state that whenever directors choose to communicate with stockholders, the duty not to speak falsely applies).

[42] *See, e.g.*, *Lake Treasure Holdings*, 2014 WL 5192179, at *10 ("As the party who controlled the General Partner, Taylor owed a fiduciary duty of loyalty which required that he act in the best interests of the Partnership for the ultimate benefit of its limited partners.") (citations omitted).

14

and lied to Leo Group and SpaceX to preserve that relationship. There are three relevant time periods at issue: (i) the three days between the signing of the LPA and Kahlon's call with Johnsen, (ii) the call with Johnsen, and (iii) the three days between Kahlon's call with Johnsen and the withdrawal of Leo Group from the Fund.

Before the call with Johnsen, Kahlon did not breach his duty of loyalty. First, Leo Group does not allege that Kahlon made any misrepresentations when asking Leo Group to contain the media attention around its investment. Second, Kahlon was not acting in his own self-interest by not previewing Leo Group's investment or disclosure obligations with SpaceX. Leo Group's belief that Kahlon could have avoided the fallout by immediately informing SpaceX about the investment does not demonstrate that Kahlon's failure to do so was disloyal. It was not Kahlon's practice to discuss prospective investors with SpaceX, and he "believed that having Leo Group as an indirect investor would be acceptable."[43] And by asking Leo Group to contain the media response, Kahlon acted within the Fund's best interest by taking immediate steps to reduce any backlash.

During the call with Johnsen, Kahlon blamed Leo Group for the media attention, refrained from mentioning his own involvement, and did not defend Leo Group. Leo Group insists, correctly, that Kahlon's actions there served his self-

---

[43] Opening Br. Ex. A (Post-Trial Op. at 16).

15

interest, but the existence of Kahlon's personal interests did not, standing alone, mean that he breached his duty to the Fund. As the Court of Chancery found, Kahlon was interested in securing the Rizvi shares because he hoped to cultivate a stronger relationship with SpaceX, and being honest about his involvement in the Leo Group investment could have upset that relationship. But that self-interest was aligned with the Fund's interest.[44] The Fund's ability to invest was inextricably tied to SpaceX trusting Kahlon—if Kahlon lost his position as a trusted intermediary, the Fund lost its opportunity to purchase SpaceX shares. Kahlon's personal interest therefore was directly correlated with the Fund's success. Because of the lock-step alignment between Kahlon's interest and the Fund's, the court correctly held that no breach occurred.[45]

Importantly, Kahlon owed a duty to the Fund as a whole during his communications with Johnsen. He was required to advance the Fund's best interest, which prevented Kahlon from prioritizing an interest that was "not shared by the [limited partners] generally."[46] The court explicitly found that "Kahlon believed—

---

[44] *See In re Speedway Motorsports, Inc. Derivative Litig.*, 2003 WL 22400758, at *2 (Del. Ch. Oct. 14, 2003), *aff'd*, 849 A.2d 931 (Del. 2004), withdrawn from bound volume and published as an affirm-on-the-basis order on May 12, 2004(finding that "[the directors'] motives for pursuing a sale were aligned with the plaintiff's interests").

[45] *See In re Pattern Energy Grp. Inc. S'holders Litig.*, 2021 WL 1812674, at *47 (Del. Ch. May 6, 2021) ("If the interests of the beneficiaries to whom the dual fiduciary owes duties diverge, the fiduciary faces an inherent conflict of interest. But if the interests of the beneficiaries are aligned, then there is no conflict.") (quoting *Chen v. Howard-Anderson*, 87 A.3d 648, 670 (Del. Ch. 2014)).

[46] *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993), *decision modified on reargument*, 636 A.2d 956 (Del. 1994) ("Essentially, the duty of loyalty mandates that the best

reasonably and in good faith—that he would not be able to change Johnsen's mind" about allowing the Fund to invest in SpaceX with Leo Group as a limited partner.[47] It was not in the Fund's interest for Kahlon to defend Leo Group; a strong defense of Leo Group, which risked the Fund's investment opportunity, would have impermissibly prioritized an individual partner's interest over the Fund as a whole.[48]

The incomplete story that Kahlon told Johnsen—that is, his failure to vigorously defend Leo Group or take responsibility for his role in the problem—also does not warrant a finding of bad faith. To support its bad-faith theory, Leo Group cites *In re Mindbody, Inc. Stockholder Litigation*, *Gantler v. Stephens*, and *Paron Capital Management, LLC v. Crombie*.[49] But in each of those cases, the fiduciary's misrepresentations served personal motives at odds with—if not directly contrary to—the interests of the stockholders or members, and the misrepresentations harmed the company or its owners.[50] Not so here. Kahlon's omissions in his

---

interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally.") (citing *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)).

[47] Opening Br. Ex. A (Post-Trial Op. at 75).

[48] *See Lake Treasure Holdings*, 2014 WL 5192179, at *10 ("As the party who controlled the General Partner, Taylor owed a fiduciary duty of loyalty which required that he act in the best interests of the Partnership for the ultimate benefit of its limited partners.") (citations omitted).

[49] *In re Mindbody, Inc., S'holder Litig.*, 332 A.3d 349 (Del. 2024); *Gantler v. Stephens*, 965 A.2d 695 (Del. 2009); *Paron Cap. Mgmt., LLC v. Crombie*, 2012 WL 2045857 (Del. Ch. May 22, 2012), *aff'd*, 62 A.3d 1223 (Del. 2013).

[50] The trial court found in *In re Mindbody, Inc. Stockholder Litigation* that the fiduciary had "disabling conflicts of interest" because of his personal need for liquidity, imminent reduction in

communications with SpaceX—a third party—did not advance his personal position with SpaceX at the Fund's expense. Although the court considered the possibility that Kahlon could have sacrificed the Fund to protect his long-term relationship with SpaceX and its affiliates, or prioritized the interests of another fund he controlled, the court ultimately concluded that Kahlon did not do so here.[51] Instead, Kahlon acted to preserve the Fund's ability to buy the Rizvi shares.

We also agree with the Court of Chancery's finding that Kahlon did not act disloyally in taking steps to cause Leo Group's withdrawal after the call with Johnsen. The court held that after the November 19 call, Kahlon used the LPA to force Leo Group's withdrawal from the Fund.[52] Leo Group did not dispute that conclusion on appeal, arguing instead that Kahlon's compliance with a contractual provision could not shield Kahlon from his earlier disloyal conduct.[53] Because we have concluded that Kahlon's earlier conduct did not violate his duty of loyalty, we agree with the court's unchallenged contractual analysis. Throughout, Kahlon acted

---

voting power, and belief that a sale to Vista would allow him to remain CEO. *In re Mindbody*, 332 A.3d at 383–85. In *Gantler*, the complaint sufficiently pleaded that some fiduciaries acted to preserve their positions, and their interests did not align with the shareholder. *Gantler*, 965 A.2d at 707 ("The pled facts are sufficient to establish disloyalty of at least three (*i.e.,* a majority) of the remaining directors, which suffices to rebut the business judgment presumption."). In *Paron*, the fiduciary took "affirmative steps to perpetuate his fraud" and "authored fraudulent marketing material based on his false record" which exposed the company "to potential liability and regulatory sanctions." *Paron*, 2012 WL 2045857, at *8.

[51] Opening Br. Ex. A (Post-Trial Op. at 49).

[52] *Id.* (Post-Trial Op. at 49–50, 73–78).

[53] Opening Br. at 29–30 n.8.

out of self-interest, but that interest aligned with the Fund's. The court did not err in finding that Kahlon did not breach his duty of loyalty.

## 2. Duty of Care

Leo Group also argues that the General Partner breached its duty of care, asserting that the Court of Chancery committed the same framing errors discussed above. "In the duty of care context[,] gross negligence has been defined as 'reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason.'"[54] We agree with the Court of Chancery that Leo Group did not carry its burden of proof.

On appeal, Leo Group relies on the court's statement that "Kahlon was to blame for not going to Johnsen earlier" to preview Leo Group's investment or blunt the effect of the disclosure.[55] But blame does not equate to gross negligence, and we do not impose liability with the benefit of hindsight.[56] The facts in the record do not support Leo Group's contention that the General Partner acted with reckless indifference to the Fund by not previewing Leo Group's investment to Johnsen.

---

[54] *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 192 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del. 2006) (quoting *Tomczak v. Morton Thiokol, Inc.*, 1990 WL 42607, at *12 (Del. Ch. Apr. 5, 1990) (internal quotations omitted)).

[55] *See* Opening Br. at 32–33 (citing Opening Br. Ex. A (Post-Trial Op. at 57)).

[56] *See, e.g.*, *In re Compellent Techs., Inc. S'holder Litig.*, 2011 WL 6382523, at *1 (Del. Ch. Dec. 9, 2011) ("Delaware law does not judge fiduciary decisions by hindsight or evaluate the merits of the decisions by what later transpired."); *cf. Law v. Law*, 753 A.2d 443, 448 (Del. 2000) (stating that the Court of Chancery's determination relied on hindsight and "[t]he conduct of a trustee in administering the trust is generally not determined to be a violation of a fiduciary duty if it was based on hindsight knowledge of subsequently developed facts and circumstances").

Notably, the court found that Kahlon "did not anticipate any problems with [Leo Group's] investment and believed [it] was acceptable."[57] At that time, Kahlon's belief that SpaceX would not object to Leo Group's participation was not grossly negligent; SpaceX had previously permitted China-based investors and had allowed other investors to publicly disclose their investment when disclosure was legally required. Although it might well have been more prudent for Kahlon to seek SpaceX's approval before admitting Leo Group into the Fund, failing to do so was not recklessly indifferent. Kahlon followed his standard practice when admitting Leo Group into the Fund.[58] Similarly, the steps that Kahlon took to reduce the media coverage and resolve the issue without escalation, instead of immediately alerting SpaceX, were an exercise in judgment and not grossly negligent.

Next, Leo Group argues that Kahlon's understanding of the parties' agreement was grossly negligent, contending that Kahlon had a flawed understanding of the agreed-upon disclosure and the advance-notice provision. First, Leo Group states that the Court of Chancery should have found gross negligence based on its earlier finding that Kahlon's interpretation of how the Side Letter interacted with the LPA was "so unreasonable as to be frivolous."[59] The court's finding about Kahlon's

---

[57] Opening Br. Ex. A (Post-Trial Op. at 16) (internal quotations omitted).

[58] *See id.* (Post-Trial Op. at 17).

[59] App. to Opening Br. at A887 (Motion to Dismiss and Motion for Summary Judgment Order). The Court of Chancery concluded that "[t]he Investor has offered the only reasonable reading of how the Side Letter interacts with the Limited Partnership Agreement. The defendants'

interpretation of the Side Letter does not establish that Kahlon's later actions fell outside the bounds of reason.[60] Leo Group did not connect Kahlon's misunderstanding of the Side Letter to any of Kahlon's actions or decisions following the disclosure. Leo Group isolates the court's description of Kahlon's lack of understanding as "strange."[61] But the court found that the impending disclosure "did not occur to [Kahlon], perhaps because he had not previously had a Chinese public company as an investor."[62] These isolated mistakes and misimpressions do not meet the high bar to establish gross negligence.

Leo Group also asserts that the court erred by requiring Leo Group to prove causation. Leo Group points to the court's comments that "Leo Group did not make a convincing case that sharing [additional] information would have changed Johnsen's mind[,] [and] [t]he press coverage about Leo Group's involvement would exist regardless."[63] Leo Group argues that these comments show that the Court of Chancery improperly required it to prove causation to rebut the business judgment

---

interpretation is so unreasonable as to be frivolous." *Id.* (Motion to Dismiss and Motion for Summary Judgment Order).

[60] Leo Group cites *Seaford Funding Ltd. Partnership v. M & M Associates II, L.P.* for the proposition that "general partners may not use the business judgment rule as a shield if they are not informed of material information reasonably available to them before making a business decision." *Seaford Funding Ltd. P'ship v. M & M Assocs. II, L.P.*, 672 A.2d 66, 70 (Del. Ch. 1995). Kahlon, however, was not uninformed about the parties' agreements; he misunderstood the provision at issue.

[61] Opening Br. Ex. A (Post-Trial Op. at 17).

[62] *Id.* (Post-Trial Op. at 17).

[63] *Id.* (Post-Trial Op. at 57).

21

rule's presumption. Although Leo Group is correct that it is not required to prove causation or injury to establish a fiduciary breach,[64] the court imposed no such requirement on Leo Group. The comments that Leo Group isolated do not disturb the court's principal finding that Leo Group had not rebutted the presumption that Kahlon acted on an informed basis. That finding is supported by the record.

Without a finding of breach, the Court of Chancery concluded that the business judgment rule applied and that Kahlon's decision to remove Leo Group using the withdrawal provision was "plainly rational."[65] Those conclusions were not based on any error of law and were supported by the record. Accordingly, we affirm the court's holding that Leo Group did not rebut the business judgment rule's presumption. We therefore need not reach Leo Group's appeal of the court's alternative entire-fairness analysis.

## B. Kahlon did not breach the Subscription Agreement's forum-selection provision.

Leo Group separately contends that the Court of Chancery erred in its interpretation of the Subscription Agreement's forum-selection clause.[66] The court

---

[64] *See Cede & Co.*, 634 A.2d at 367 ("Applying controlling precedent of this Court, we hold that the record evidence establishes that Cinerama met its burden of proof for overcoming the rule's presumption of board duty of care in approving the sale of the company to MAF. The Chancellor's restatement of the rule—to require Cinerama to prove a proximate cause relationship between the Technicolor board's presumed breach of its duty of care *and* the shareholder's resultant loss—is contrary to well-established Delaware precedent.") (emphasis in original).

[65] Opening Br. Ex. A (Post-Trial Op. at 59).

[66] In addition to the LPA and the Side Letter, the Subscription Agreement set forth terms for Leo Group to become a limited partner in the Fund. Under the Subscription Agreement, Leo Group

22

held that the clause was a "one-way" provision that bound only the subscriber, not Kahlon, and that Kahlon's decision to sue Leo Group in California, therefore, was not a breach of contract.[67]  We agree.

On appeal, Leo Group maintains that the forum-selection provision is bilateral, binding both parties to sue in Delaware on any claims relating to the Subscription Agreement,[68] and that Kahlon's breach of that provision entitles Leo Group to damages in the form of the legal fees it incurred in the California action. In response, Kahlon endorses the court's interpretation and notes that "it is entirely unclear that this Court (or the trial court) can or should award damages [in this scenario.]"[69]

> The relevant portion of the forum-selection provision states:
>
> To the maximum extent not prohibited by applicable law, any action or proceeding brought by the Subscriber against the General Partner or the Management Company (or their respective direct or indirect owners, officers, directors, managers, agents or employees in their capacity as such, or in any related capacity) or the Partnership, or relating in any way to the Subscription Documents or any other Offering Materials, shall be brought and enforced in the courts of the State of Delaware or

---

agreed to "(a) become a limited partner in Tomales Bay Capital Anduril III, L.P., . . . (b) adhere to, comply with, be bound by and receive the benefits of the terms of the Partnership Agreement . . . , and (c) make aggregate cash contributions to the capital of the Partnership . . . ."  App. to Opening Br. at A765 (Subscription Agreement § 1).

[67] Opening Br. Ex. A (Post-Trial Op. at 85).

[68] Opening Br. at 46.

[69] Answering Br. at 60.  Ordinarily, we would agree with Kahlon that this issue is one for the California court to resolve in the first instance.  But the matter before the California court appears to have been dismissed (Case No. 24-cv-04776-MMC).  We view the issue as straightforward and therefore resolve it, while intending no disrespect to our sister court.

(to the fullest extent subject matter jurisdiction exists therefore) of the United States District Court for the District of Delaware . . . .[70]

The Court of Chancery interpreted that provision as applying to "any action or proceeding *brought by the Subscriber*" (1) "against the General Partner or the Management Company . . . or the Partnership, *or*" (2) "relating in any way to the Subscription Documents or any other Offering Materials . . . ."[71]

Leo Group asserts that this reading cannot be correct and insists the provision should be read as follows: "any action or proceeding" (1) "brought by the Subscriber against the General Partner or the Management Company . . . or the Partnership, *or*" (2) "relating in any way to the Subscription Documents or any other Offering Materials . . . ."[72] Even if Leo Group's reading was plausible when read in isolation, it cannot be squared with the rest of the paragraph, including the consent-to-jurisdiction, venue, and jury-trial clauses.

Immediately following the above-quoted forum-selection clause, the remainder of the subsection reads:

> [T]o the extent not prohibited by applicable law, the Subscriber irrevocably submits to the non-exclusive jurisdiction of such courts in respect of any action or proceeding between it and the General Partner or the Management Company (or their respective direct or indirect owners, officers, directors, managers, agents or employees in their capacity as such, or in any related capacity) or the Partnership, or

---

[70] App. to Opening Br. at A784–85 (Subscription Agreement § 5(i)).

[71] *See id.* (Subscription Agreement § 5(i)) (emphasis added).

[72] *See id.* (Subscription Agreement § 5(i)) (emphasis added).

24

relating in any way to the Subscription Documents or any other Offering Materials. The Subscriber irrevocably waives, to the fullest extent not prohibited by applicable law, any objection that it may now or hereafter have to the laying of venue of any such action or proceeding in the courts of the State of Delaware or the United States District Court for the District of Delaware and any claim that any such action or proceeding brought in either court has been brought in an inconvenient forum. THE SUBSCRIBER AND THE GENERAL PARTNER, ON BEHALF OF ITSELF AND THE PARTNERSHIP, IRREVOCABLY WAIVE, TO THE FULLEST EXTENT NOT PROHIBITED BY APPLICABLE LAW, ANY RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY ACTION OR PROCEEDING BY OR AGAINST THE GENERAL PARTNER OR THE MANAGEMENT COMPANY (OR THEIR RESPECTIVE DIRECT OR INDIRECT OWNERS, OFFICERS, DIRECTORS, MANAGERS, AGENTS OR EMPLOYEES IN THEIR CAPACITY AS SUCH, OR IN ANY RELATED CAPACITY) OR THE PARTNERSHIP, OR IN ANY WAY RELATING TO THE SUBSCRIPTION DOCUMENTS OR ANY OTHER OFFERING MATERIALS.[73]

Read as a whole, the first three sentences of this subsection refer exclusively to the subscriber—limiting where the subscriber may sue, establishing the subscriber's consent to jurisdiction in Delaware, and waiving the subscriber's objection to venue.[74] The final sentence, in contrast, is bilateral, expressly providing that both the subscriber *and* the General Partner waive any right to a jury trial. The difference in language between the first three sentences and the last permits only one reasonable interpretation: the forum-selection provision is unilateral, binding only Leo Group.

---

[73] *Id.* (Subscription Agreement § 5(i)).

[74] *See BitGo Holdings, Inc. v. Galaxy Digital Holdings, Ltd.*, 319 A.3d 310, 322 (Del. 2024) ("When interpreting a contract, Delaware courts read the agreement as a whole and enforce the plain meaning of clear and unambiguous language.") (quoting *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021)); *see also Thompson St. Cap. Partners IV, L.P. v. Sonova United States Hearing Instruments, LLC*, 340 A.3d 1151, 1167 (Del. 2025).

Leo Group also takes the position on appeal that the California action violated the jury-waiver clause. Kahlon objects to this claim of error because the jury-waiver issue was not raised below. Leo Group does not contest this point, arguing instead that "this clause is in the exact same paragraph as the forum-selection clause, and the two go hand-in-hand."[75] Given Leo Group's concession that it did not directly raise the jury-waiver issue below, the argument is forfeited.[76]

## C. The Court of Chancery did not err in awarding Leo Group nominal damages.

On cross-appeal, Kahlon challenges the Court of Chancery's holding that he breached his "duty of candor" when communicating with Leo Group.[77] The court held *sua sponte* that Kahlon failed to communicate honestly with Leo Group after the phone call with Johnsen. Based on that holding, the court awarded Leo Group $1 in nominal damages after finding that Leo Group failed "to prove reliance or any

---

[75] Appellant's Reply Br. at 22.

[76] Supr. Ct. R. 8 ("Only questions fairly presented to the trial court may be presented for review; provided, however, that when the interests of justice so require, the court may consider and determine any question not so presented."); *Russell v. State*, 5 A.3d 622, 627 (Del. 2010), *as corrected* (Sept. 29, 2010); *State Farm Mut. Auto. Ins. Co. v. Spine Care Delaware, LLC*, 238 A.3d 850, 859 (Del. 2020) ("We first note that [the appellee] did not make this particular argument in the proceedings below and thus, the argument is waived.").

[77] In *Stroud v. Grace*, we expressed our disfavor with the term "duty of candor" because of its "confusing and imprecise" application. *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992) (stating that the term "has no well accepted meaning in the disclosure context"). Here, it is more accurate to view Kahlon's actions as a breach of his duty of loyalty, which includes a requirement that directors "deal honestly with stockholders." *See Dohmen v. Goodman*, 234 A.3d 1161, 1169 (Del. 2020) (referencing *Malone*, 722 A.2d at 10).

26

causally related harm."[78]   Kahlon contends that this finding was legal error either because (i) Kahlon's misrepresentations were not material, or (ii) Leo Group failed to prove causation and damages, and nominal damages are not available under these circumstances.[79]

In *Dohmen v. Goodman*, we explained that "a director's specific disclosure obligations are defined by the context in which the director communicates, as are the remedies available when a director fails to meet his obligations."[80]   We identified two distinct contexts in which a communication occurs: (i) a communication associated with a request for stockholder action, and (ii) a communication *not* associated with a request for stockholder action.[81]   In the latter context, the fiduciary duty of disclosure "does not apply," but a director "must still deal honestly with

---

[78] Opening Br. Ex. A (Post-Trial Op. at 69).

[79] Leo Group objects to this claim on appeal, asserting that Kahlon has waived his challenge to this finding because Kahlon's notice of appeal states that the appellees "were *not* appealing from the court's liability findings." Appellant's Reply Br. at 29. In response, Kahlon highlights that its notice of appeal covered "the two fee orders and '*any and all orders or rulings antecedent and ancillary thereto*.'" Appellee's Reply Br. at 2 (emphasis in original). Leo Group's arguments, however, are not particularly compelling because looking to a notice of appeal is not how this Court evaluates whether a claim of error was fairly raised. Instead, "[t]he failure to raise a legal issue in the text of the *opening brief* generally constitutes a waiver of that claim on appeal." *Murphy v. State*, 632 A.2d 1150, 1152 (Del. 1993) (citations omitted) (emphasis added). Kahlon addressed this issue in the Answering Brief/Cross-Appeal Opening Brief. The issue is not waived.

[80] *Dohmen*, 234 A.3d at 1168.

[81] *Id.* at 1168–69.

stockholders."[82] If a director intentionally provides false information or misleads a stockholder, the director breaches the duty of loyalty.[83]

It is this latter context that applies to Kahlon's communications with Leo Group and in which the Court of Chancery found a breach of Kahlon's duty to speak honestly when communicating with individual investors. The Court of Chancery held that, "[w]hen Kahlon chose to speak to Leo Group in these settings, he took on a duty to speak honestly and completely. He could not engage in partial or misleading disclosures. By speaking falsely and partially, Kahlon failed to comply with his duty of candor."[84]

To state a claim in this context—unlike a duty of disclosure claim—Leo Group must prove that Kahlon knowingly disclosed false information.[85] That scienter requirement distinguishes innocent or negligent disclosures from those that are intentionally misleading.[86] The court did not expressly address scienter. Nevertheless, the court's post-trial factual findings support the conclusion that Kahlon knowingly disclosed false—or at least intentionally misleading— information to Leo Group after the Johnsen phone call, including the letters that

---

[82] *Id.* at 1169.

[83] *See id.*

[84] Opening Br. Ex. A (Post-Trial Op. at 69).

[85] *Dohmen*, 234 A.3d at 1169 (citing *Malone*, 722 A.2d at 9).

[86] *Id.* ("By requiring scienter, we have sought to distinguish innocent or negligent disclosure violations from those involving an intent to mislead stockholders.").

28

contained "conflicting accounts," Kahlon's depiction of "Johnsen's reaction as capricious," and Kahlon's concealment of his failure to inform SpaceX of his involvement.[87] We can discern no error in the trial court's holding that Kahlon acted disloyally by misrepresenting and concealing facts during his post-call communications with Leo Group. The record supports the court's holding that Kahlon breached his fiduciary duty to Leo Group by intentionally attempting to mislead it regarding the call with Johnsen and the reasons for the forced withdrawal.

Having identified a breach of Kahlon's duty of loyalty, the court found that Leo Group could not establish the remaining elements that *Dohmen* requires to award compensatory damages.[88] The court therefore awarded $1 in nominal damages after finding that Leo Group failed "to prove reliance or any causally related harm."[89] Although Leo Group failed to establish that it was entitled to compensatory damages, it was within the trial court's broad discretion to award $1 in nominal damages "simply for the purpose of declaring an infraction of [Leo Group's] rights and the commission of a wrong."[90]

---

[87] Opening Br. Ex. A (Post-Trial Op. at 69).

[88] *Dohmen*, 234 A.3d at 1172.

[89] Opening Br. Ex. A (Post-Trial Op. at 69).

[90] *Ravenswood Inv. Co., L.P. v. Est. of Winmill*, 2018 WL 1410860, at *25 (Del. Ch. Mar. 21, 2018) (citations omitted). In *Dohmen*, we clarified that *per se* damages—meaning damages from presumed harm—stemming from a breach of the fiduciary duty of disclosure were typically limited to nominal damages. To recover compensatory damages in the breach of the duty of disclosure context not involving a collective action problem (*see In re Columbia Pipeline Inc. Merger Litig.*, 299 A.3d 393, 492 (Del. Ch. 2023*), rev'd on other grounds*, 342 A.3d 324 (Del. 2025)), reliance

**D.    The Court of Chancery erred in awarding attorneys' fees to Leo Group.**

The court awarded Leo Group the full amount of its requested fees, totaling $15,828,174.05, based on its finding that Kahlon breached his "duty of candor."[91] On cross-appeal, Kahlon contends that the court erred in awarding attorneys' fees to Leo Group because the fee-shifting award was based on the faulty breach of the "duty of candor" finding. We conclude that the Court of Chancery's fee award, which was based on our decision in *William Penn Partnership v. Saliba*, must be reversed.

In awarding attorneys' fees, Delaware follows the "American Rule," which holds litigants responsible for their own costs.[92] The American Rule, however, has "limited equitable exceptions," including when a party acts in "bad faith" during the litigation.[93]

The Court of Chancery primarily based the fee award on its conclusion that "a beneficiary can recover expenses from a fiduciary when it would be 'unfair and inequitable for [the beneficiary] to shoulder the costs of litigation arising out of

---

and causation must be proven. We also reinforced in *Dohmen* that, outside the duty of disclosure context, if fiduciaries choose to communicate with equity owners, they must do so honestly. Although the *per se* damages rule does not apply outside the fiduciary duty of disclosure context, the court may still award nominal damages for a breach of the duty of loyalty, even if reliance and causation are not proven.

[91] Opening Br. Ex. C (Fee Award at 4).

[92] *DeMatteis*, 315 A.3d at 508; *In re Delaware Pub. Schs. Litig.*, 312 A.3d 703, 715–16 (Del. 2024).

[93] *DeMatteis*, 315 A.3d at 508–09.

improper prelitigation conduct attributable to the [fiduciary] that amounted to a violation of their fiduciary duties.'"[94] In *Saliba*, the Court of Chancery reasoned that "[t]hose who violated their fiduciary obligations and were the cause of this litigation are the parties who properly should bear the fees and costs made necessary solely by reason of their faithless conduct."[95] We affirmed the fee-shifting award in *Saliba*, recognizing that "the Court of Chancery 'has broad discretionary power to fashion appropriate equitable relief.'"[96] In *Saliba*, the plaintiffs "were left without a typical damage award because the Court's appraisal of the property came in at a value lower than the sale price," and without the award the plaintiffs "would have been penalized for bringing a successful claim against [the fiduciaries] for breach of their fiduciary duty of loyalty."[97]

Although both Kahlon and the *Saliba* fiduciaries breached their duties, that is where the cases' similarities begin and end. In *Saliba*, the Court of Chancery held that the fiduciaries acted in their own self-interest by orchestrating the sale of the company's sole asset to themselves on favorable terms, all while misrepresenting or concealing material information that thwarted the other members' efforts to buy the

---

[94] Opening Br. Ex. B (Order and Final Judgment at 5) (quoting *William Penn P'ship v. Saliba*, 13 A.3d 749, 758–59 (Del. 2011)).

[95] *Saliba v. William Penn P'ship*, 2010 WL 1641139, at *1 (Del. Ch. Apr. 12, 2010), *aff'd*, 13 A.3d 749 (Del. 2011).

[96] *Saliba*, 13 A.3d at 758.

[97] *Id.* at 759.

31

asset.[98]  We described the conduct as "egregious" and affirmed the Court of Chancery's decision that the process was not entirely fair.[99]  But because the asset appraised for less than the faithless fiduciaries paid, the plaintiffs were left without any monetary damages.[100]  Under these circumstances, we held that the Court of Chancery's fee award was within its equitable powers.[101]

Here, by contrast, the court held that Leo Group "did not succeed in a meaningful way on any of its claims for breach of fiduciary duty," finding that Leo Group prevailed only on the "candor" claim that the court raised *sua sponte*.[102] Despite finding that Leo Group failed to carry its burden, and after concluding in the alternative that the challenged conduct was entirely fair, the court awarded Leo Group all of the fees it incurred in the unsuccessful litigation.  Although we do not condone Kahlon's misrepresentations to Leo Group after the call with Johnsen, Leo Group's failure to prove causation or damages associated with that breach distinguishes this case from the unusual facts in *Saliba*.  Accordingly, the court's decision to award attorneys' fees under *Saliba* for Kahlon's pre-litigation conduct

---

[98] *Id.* at 758.

[99] *Id.* at 751 ("The Chancellor correctly found that the Lingos, acting for the William Penn Partnership, failed to meet their burden of establishing the entire fairness of the transaction because their prelitigation conduct rose to egregiousness and therefore, he did not abuse his discretion by awarding attorneys' fees.").

[100] *Id.* at 759.

[101] *Id.*

[102] Opening Br. Ex. A (Post-Trial Op. at 34–35).

32

was misplaced. Although the court's order also referred in passing to Kahlon's litigation conduct, Leo Group did not make a claim for fee shifting under the bad-faith exception to the American Rule, and the court awarded other relief, including a heightened burden of proof, associated with the issues that arose during the litigation.

At bottom, Leo Group prevailed on a single issue raised *sua sponte* by the court, resulting in an award of nominal damages. This single finding in favor of Leo Group does not warrant a fee award of nearly $16 million to compensate Leo Group for litigating a case that it lost on almost every issue. Accordingly, we reverse the Court of Chancery's judgment awarding Leo Group attorneys' fees and expenses.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the Court of Chancery is **AFFIRMED in part** and **REVERSED in part**.

33